**L. W. BROOKS, Jr. and Jane R. Brooks, et al., Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 27517.

United States Court of Appeals, Fifth Circuit.

April 8, 1970.

See 1 Collier, Bankruptcy § 17.14 [8] (14th rev. ed. 1967).

Buford P. Berry, J. W. Bullion, Dallas, Tex., for petitioners-appellants.

Johnnie M. Walters, Asst. Atty. Gen., Washington, D. C., Richard M. Hahn, Acting Chief Counsel, Internal Revenue Service, Washington, D. C., Lee A. Jackson, Grant W. Wiprud, William L. Goldman, Attys., U. S. Dept. of Justice, Washington, D. C., for respondent-appellee.

Before GEWIN, COLEMAN and DYER, Circuit Judges.

DYER, Circuit Judge.

In this appeal by the taxpayers [1] from the decision of the Tax Court, the transactions involved are as simple as ABC [2] but the tax consequences are not. The Tax Court held that the taxpayers, having purchased oil and gas working interests burdened by retained production payments, were required to capitalize, as additional costs of acquiring the properties, the expenses incurred by them allocable to the lifting of the oil accruing to the production payment.[3] We disagree and reverse.

In an ABC transaction the taxpayers, as independent oil and gas operators, each acquired a one-eighth interest in certain oil and gas leases located in Baylor County, Texas. They, and their co-owners, purchased all of the working interests in the Baylor properties for a cash consideration of $475,000.00. In the assignment to taxpayers and their co-owners the seller retained a produc-

---

1. For convenience, L. W. Brooks, Jr. and Jane R. Brooks, his wife, and W. J. Rhodes and Ellie T. Rhodes, his wife, will be jointly referred to as the taxpayers.

2. In oil and gas·leasing parlance, ABC designates a transaction in which A, the owner of producing oil and gas leases, sells to B the working interest in such leases for a cash consideration and retains a production payment in a specified dollar amount together with an amount equal to interest on the unliquidated principal balance of the payment. At the same time, A sells the retained production payment for a purchase price equal to its principal amount to C, who finances the purchase by a loan from a lending institution, secured by a deed of trust and mortgage on the production payment and an assignment of the income accruing to the production payment.

With a slight alphabetical twist ACB designates a transaction in which A sells the oil and gas leases to C, who finances the purchase by selling the working interest in such leases to B for a cash consideration, subject to a retained production payment. C then borrows an amount equal to the production payment as security for the loan.

Both ABC and ACB transactions are involved in this appeal.

3. 50 T.C. 927 (1968).

tion payment in the primary sum of $500,000.00 free and clear of expenses, which was later transferred by the seller to a third party. This payment was to be dischargeable out of eighty-five percent of the net production, i. e., total production of the working interest less any landowner's royalties or overriding 'royalties. As assignees of the working interest, the taxpayers and their co-owners were obligated to deliver all production accruing to the reserved production payment to the pipeline free of all costs.

In accordance with the provisions of the assignment of the working interest and the underlying leases, each taxpayer paid his pro-rata share of operating the Baylor properties.

In connection with the Baylor properties two projections of production were made, one by an independent petroleum consulting firm and the other by one of the purchasers, an experienced petroleum engineer. They both estimated that the share of production accruing to the operators would be sufficient during the first or second year to cover estimated direct and overhead expenses. One report included depreciation of the lease equipment and the other did not. Both projections indicated that the production payment would be paid out in the first or second year of operation.

Neither the oil produced nor the operating expenses met the projections and the taxpayers had a net loss for the years in question. It is undisputed, however, and the Tax Court found, that when the taxpayers purchased the Baylor properties they did so with the purpose and expectation of operating them at a profit.

In an ACB transaction the taxpayers each acquired an undivided one-fourth interest in eleven oil and gas leases in Stephens County, Texas (known as the Gulf properties). The taxpayers and their co-owners purchased all of the

working interest in such properties for a cash consideration of $107,000.00. The seller reserved a production payment in the primary amount of $402,500.00 dischargeable out of eighty-five percent of the net production. As assignees of the working interest, the taxpayers and their co-owners were obligated to deliver all production accruing to the reserved production payment to the pipeline free and clear of all costs. Each taxpayer paid his pro-rata share of the costs of operating the Gulf properties.

In connection with the acquisition of these properties taxpayer Brooks prepared an estimate of income and expenses based on prior year figures. According to this projection, the production payment would pay out in the fourth or fifth year after acquisition. The projection, however, further showed that the income accruing to the working interest during payout would not be sufficient to cover the direct expenses and overhead.

The income accruing to the working interest did not meet the projected amounts. Expenses also exceeded the projections. It was again undisputed, and the Tax Court found, that the taxpayers entered into the transaction for the purpose and expectation of making a profit.

The Commissioner determined that with respect to both the Baylor and Gulf properties the excess of costs over income accruing to the working interest was foreseeable and should be capitalized as costs of acquiring the properties.[4] The Tax Court declined to accept the rationale for the Commissioner's determination but sustained the deficiencies on the ground that, without regard to losses, that portion of operating costs allocable to production of the oil used to pay out the production payments should be capitalized as costs to the operators of acquiring their properties. The Tax Court accepted and applied the Commissioner's

4. For want of a better name this rule applied by the Commissioner is known as the "loss capitalization doctrine." Simons, "Special Tax Problems of Purchasers of Operating Mutual Interests in ABC

Transactions—The 'Loss Capitalization Doctrine' and Allocation of the Cash Consideration." P–H Oil and Gas Taxes, par. 4028.6 (1967).

calculation of the amount of allocable operating costs to be capitalized under the loss capitalization rule, rather than making an attempt to determine what portion of operating costs should be fully capitalized. The Commissioner urges us to affirm, either under the loss capitalization rule that he espouses or under the rationale of full capitalization as propounded by the Tax Court. Before the Tax Court and now here the taxpayers argue that their full operational costs should be deductible as ordinary and necessary business expenses under '§ 162 of the Internal Revenue Code.[5]

We observe, *in limine*, the anomalous posture of the case as it comes to us. The Tax Court based its decision on a novel theory of capitalization which was not raised, briefed or argued by either party. Furthermore, it accepted *for this case* only the Commissioner's calculation of the portion of operating costs to be capitalized as determined under the loss capitalization rule "despite its discredited parentage." In the usual circumstances we would reverse and remand so that "in an area where fine distinctions are frequently fundamental yet 'hardly can be held in the mind longer than it takes to state them' " [6] both parties may be given an opportunity to brief and argue the merits of the new theory. Since, however, the evidence is, in all essentials, undisputed, and the parties have briefed and argued the case fully here, we can see no useful purpose that would be served in remanding for further consideration.

## Loss Capitalization Rule

In the usual case all lease operating expenses which are ordinary and necessary expenses are deductible under Section 162 of the Internal Revenue Code.[7] Nevertheless, in ABC and ACB transactions the Commissioner has for many years applied the loss capitalization rule in instances where the purchaser of the working interest knows at the outset, or should reasonably anticipate, that the share of production accruing to the working interest, during payment, will not cover his operating expenses. The rule requires the purchaser of the working interest to capitalize, as additional acquisition costs, the amounts by which his operating expenses exceed his share of production. While no public announcement of this doctrine has ever been made, it has been administratively applied for many years and has been reflected in private rulings. This is not to say that the propriety of the rule was not questioned.[8]

Although the Commissioner pressed for the application of his loss capitalization rule in the Tax Court, that Court made no findings concerning whether losses should reasonably have been anticipated by the taxpayers. Instead it rejected the rule *per se*. Therefore the propriety of the rule is squarely presented.

The Tax Court, having found that the taxpayers purchased their interest in the *Baylor* and *Gulf* properties with the purpose of operating them for a profit, held that there need not be "an expectation

---

5. Section 162 provides:
   162(a) In General.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *.

6. Dissenting Opinion, 50 T.C. p. 939 quoting Burton-Sutton Oil Co. v. Commissioner of Internal Revenue, 1946, 328 U.S. 25, 38, 66 S.Ct. 861, 868, 90 L.Ed. 1062.

7. See note 5, *supra*.

8. Heard, Capitalization of Excess Operating Expenses in ABC Transactions— Fallacy and Fallout, 18 Oil and Gas Inst.

451 (S.W.Legal Fdn.1967) ; Loftin, Skinner and Simons, Special Tax Problems of Purchasers of Operating Mineral Interests in ABC Transactions—The "Loss Capitalization Doctrine" and Allocation of the Cash Consideration, P-H Oil and Gas Taxes, par. 4028; 1956–5 CCH Fed. Tax.Rep., par. 6608. See also Burns v. United States, W.D.Tex., 1965, 16 A.F. T.R.2d 5015, in which the District Court found that the excess of operating expenses over taxable income from a lease acquired in an ABC transaction should be capitalized rather than expensed, but set forth no predicate for its conclusion.

to make a profit each year for the business expenses of that year to be deductible." [9] It noted that organizers of new businesses realize that they are going to lose money in the early years, but are willing to do so because they can soundly prognosticate that eventually the business will be profitable. The Tax Court concluded that "[t]o adopt the theory urged by the respondent in this case would mean that in the case of every such new business, their early losses would not be deductible. Clearly, that is not the law."

The Commissioner urges that the Tax Court misconceived the scope and thrust of the loss capitalization rule because it is precisely addressed to the economic realities of a particular form of mineral transaction and is not concerned with early losses of new businesses generally. The Commissioner points out that the rule relates specifically and solely to foreseeable losses suffered during the payout of retained production payments in ABC or ACB transactions. It simply gives logical tax consequences, the Commissioner says, to the course of action chosen by the purchaser of the working interest. We disagree.

We see no justification for the Commissioner to define and refine a single exception to the expensing of operating costs, applicable only to properties purchased in an ABC or ACB transaction. The Commissioner has consistently issued rulings allowing the working interest owner to deduct all operating expenses except those subject to the disallowance under the loss capitalization rule.[10] In allowing deductions of operating expenditures to the purchaser of the working interest to the extent of his share of production accruing to his interest, the Commissioner must concede that such expenditures fall within the scope of Section 162. If the operator makes a profit during payout he may deduct all the expenses including those allocable to the production payment. It is difficult, if not impossible, to rationalize how the capitalization of such expenditures to the extent that they exceed income should be required. Particularly in view of Regulations Section 1.162–1 [11] it would seem clear that "the production of current [net] income is not a proper criterion in determining the availability of a current deduction under Section 162." [12] "The essential tax question is not for what period of time the taxpayer may anticipate a loss; it is rather whether the taxpayer is engaged in a trade or business. The Revenue Service has long acknowledged this to be the test." [13]

We have not found, nor have we been guided by the Commissioner to any rationale having a basis in the Code or Regulations for the loss capitalization rule. It has been aptly said "that the loss capitalization area is as deserving of being labeled a morass as any area of the tax law." [14] It cannot be reconciled with any known tax principle.[15] We concur in the Tax Court's unanimous disapproval of the rule.

9. The Tax Court held that § 1.162–1 of the Income Tax Regulations was applicable. It provides: "The full amount of the allowable deduction for ordinary and necessary expenses in carrying on a business is nevertheless deductible, even though such expenses exceed the gross income derived during the taxable year from such business."

10. See Loftin, Recent Developments in Oil and Gas Transactions, Southwestern Legal Foundation Seventh Annual Institute on Oil and Gas Law Taxation, 430 (1966). Indeed the Commissioner has even required the owner of the working interest to deduct all operating expenses in computing the interest he owns in determining the percentage depletion allowance. Treas.Reg. § 1.614–2(b).

11. See note 9, *supra*.

12. Special Tax Problems of Purchasers in ABC Transactions, P–H Oil and Gas Taxes, par. 4028.7.

13. Heard, Capitalization of Excess Operating Expenses in ABC Transactions— Fallacy and Fallout. *See* note 8, *supra*.

14. P–H Oil and Gas Taxes, par. 4028.14.

15. Hambrick, Another Look at Some Old Problems—Percentage Depletion and the ABC Transaction, 34 Geo.Wash.Univ. Law Rev. (1965–1966).

## Full Capitalization

Relying on Thomas v. Perkins, 1937, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324, the Tax Court held that when the taxpayers purchased their working interests in the ABC and ACB transactions, they acquired no rights to the oil accruing to the production payment since the owner of the reserved production payments owned that oil in place. Consequently, the taxpayers' expenses in lifting the oil were in part attributable to the production of income for someone else and such allocable part was not an expense of the taxpayers and was not deductible by them. Thus, the Court said, the operating costs which were attributable to the production payments but which were borne by the taxpayers were an additional cost of acquiring the working interest and this cost must be capitalized. In a nutshell, the Tax Court held that operating costs attributable to production payments should be fully capitalized without regard to losses during payout. Since neither party had raised or argued this novel theory the Tax Court found "that it would be inadvisable for us to adopt and apply an allocation rule not raised and argued in the case." Instead, the Court allocated the *excess* of operating costs in accordance with the loss capitalization rule that it had rejected. We do not reach the question of allocation of operating expenses because we disagree with the Tax Court's full capitalization doctrine.

■ No one disputes that here, as is customary in ABC or ACB transactions, the contracts provided that all the operating costs were the burden of the working interest. The Commissioner nevertheless argues that the operating costs allocable to the production payments were part of the costs of acquiring the capital assets and therefore must be capitalized. This is so, says the Commissioner, because the real assets of value which the taxpayers purchased were the recoverable reserves of oil in the ground, with enjoyment deferred until payout of the production payments. Thus the acquisition of an increased portion of net production from the lease after the payout period was the capital asset acquired and the payment of the operating expenses to produce the oil to payout the production payment was the cost of acquiring this asset. In a nutshell the Commissioner says that the fact that production of oil accruing to the production payments brings closer the date when the working interest will be freed of those reserved interests makes a properly allocable part of the operating expenses a capital expenditure.

Clearly departing from his loss capitalization doctrine the Commissioner further asserts that all operating expenses allocable to the production payment must be capitalized even if, in spite of the large percentage of production allocated to the production payments, the operator is able to make a profit during payout. Producer Chemical Co. v. Commissioner, 50 T.C. 940. (This is the sister case, decided by the Tax Court the same day as the case *sub judice*.) His position is thus applicable to any reserved production payment whether reserved in an ABC or ACB transaction, and, contrary to his loss capitalization rule, regardless of whether the percentage of production out of which it is dischargeable enables the operator to make a net profit.

The Commissioner thus alternatively adopts the Tax Court's rationale which is bottomed on the basic assumption that part of the operating expenses were allocable to the production payment and were thus the expenses of another. By applying an economic consequences theory announced in Thomas v. Perkins, *supra* (that is, that the owner of a production payment has an economic interest in the oil in place and the oil which accrues to the production payment is not included in the gross income of the operator) the Tax Court has, in effect, said that each barrel of oil produced is burdened by a portion of the cost of production, and thus each economic interest is

burdened by a portion of the operating expenses. We reject this premise as unsound.

■ So far as we have been able to ascertain, the economic interest concept has never had a place in determining who is entitled to the operating expense deduction as between operating and non-operating interests, nor has it been utilized for the purpose of reallocating the burden of operating mineral properties between operating and non-operating interests or the tax consequences flowing from the satisfaction by expenditure of that burden. Economic consequences theories aside,[16] we think that the proper allocation of where the operating expense burden lies depends on the type of legal estate or interest involved. We said in United States v. Cocke, 5 Cir. 1968, 399 F.2d 433, 445, cert. denied, 394 U.S. 922, 89 S.Ct. 1187, 22 L.Ed.2d 455 "title is relevant in tax litigation only insofar as significant benefits or burdens accompany it."

■ A fundamental characteristic of a production payment is that it is not burdened with any of the operating expenses of a lease.[17] It is payable only out of production, and there is no personal liability on the part of the owner of the production payment. The production payment owner has no possessory interest, no right to drill, no right to the surface, and no claim to possession. Standard Oil Company of Texas v. Marshall, 5 Cir. 1959, 265 F.2d 46.

His interest is an incorporeal hereditament in the nature of an overriding royalty creating a present interest in land in the payee.[18] Since under no circumstances will the owner of the production payment become liable for the operating expenses, the operator of the working interests does not satisfy the debts of another when he incurs the expenses of lifting the oil.

On the other hand "[t]he working interest, for federal tax purposes, is an interest in oil and gas in place that is burdened with the cost of development and operation of the property."[19] Thus the duty to discharge the operating expenses is something that is acquired when the working interest is assigned—the expenses are an attribute of the estate and as such they cannot logically be a part of the cost of acquiring the already burdened working interest estate.

■ We agree with the Commissioner that when expenses which would otherwise be ordinary and necessary business expenses and deductible as such are incurred or paid to construct a capital asset, they are capital expenditures. But here the payment of the operating expenses added not one drop to the reserves of oil which the owner of the working interest obtained. They acquired all of the reserves that would ever accrue to their interest in the properties when they made their cash payments to the sellers who reserved the production payment.[20]

---

16. We are not sure that the Tax Court has properly applied the economic consequences theory to the operating expenses deduction. The realities of the situation, as we pointed out in United States v. Cocke, 5 Cir. 1968, 399 F.2d 433, cert. denied, 394 U.S. 922, 89 S.Ct. 1187, 22 L.Ed.2d 455, are that the operator bears all the risk that the oil produced will not pay for the operating expenses. Thus, the economic consequences to the operator would be quite real. The owner of the production payment, on the other hand, does not incur such risks because he, of course, is not liable for the operating expenses.

17. Brown, Law of Oil and Gas Leases, Section 17.03 (2 ed. 1967); Williams and

Myers, Oil and Gas Law, Vol. 3, Section 645 (1968).

18. If a production payment is burdened with a portion of operating expenses it is no longer a true production payment. Walker, Oil Payments, 20 Tex.L.Rev. 259 (1942).

19. Breeding and Burton, Income Taxation of Oil and Gas Production, Section 2.04 (1961).

20. Stevens v. Commissioner of Internal Revenue, 6 Cir. 1968, 388 F.2d 298; Acer Realty Co. v. Commissioner of Internal Revenue, 8 Cir. 1942, 132 F.2d 512; Willcuts v. Minnesota Tribune Co., 8 Cir. 1939, 103 F.2d 947; and Great Northern Railway Co. v. Commissioner,

The taxpayers are in no different position than the purchaser of a working interest subject to a royalty, an overriding royalty, or a net profits interest. In the latter case the Commissioner has uniformly recognized and held that all operating expenses are deductible.[21] Nevertheless he here contends that a payment which does not add to the estate but which only results in an accelerating of the realization of more income is a capital item. While recognizing that traditionally all operating expenses were deemed a burden of the working interest, the Commissioner would distinguish a retained production payment from other non-operating interests because the latter are in effect sharing arrangements for the life of the property while a production payment is fixed in amount and duration.[22] We are unwilling to accept the Commissioner's dogma that the character of a non-operating interest which never passes to the assignee is a proper or relevant touchstone of whether all operating expenses are deductible by the operator or whether a part of them must be capitalized by him because during the payout period the effect on the operator is the same regardless of the character of the non-operating interest.

Until the production payment pays out, its owner shares in the mineral deposit in the same manner as an unlimited royalty owner. His income derives exclusively from the mineral deposit which is lifted free of cost to him by the operator, exactly as in the case of an unlimited royalty owner. We think the termination date of the non-operator's interest is a distinction without a difference.

Finally, the full capitalization doctrine is, in our view, out of harmony with our decision in *Cocke, supra*, in which we held that bearing the burden of development and operation is an attribute of the working interest. To transmute to the production payment interest a portion of the burden here would lose sight of the economic reality that the burden is borne only by the operating interest.

We must not let possible disdain for the ABC transaction nibble away its sanction by impermissible theories of capitalization of expenses attributable to oil and gas production.

We conclude that the working interest estate was burdened with all the operating costs paid by the taxpayers and that such costs are therefore deductible by them.

Reversed.

---

8 B.T.A. 225 (1927), aff'd, 8 Cir. 1930, 40 F.2d 372, relied on by the Commissioner are inapposite. They simply stand for the broad proposition that when expenses are incurred to construct or acquire a capital asset, the expenses must be capitalized.

21. Special Tax Problems of Purchasers in ABC Transactions, P–H Oil and Gas Taxes, par. 4028.7.

22. Hambrick expresses the view that there should be a difference in treatment because unlimited non-operating rights involve sharing arrangements while production payments are sales severing the sellers' connections with the mineral deposit. See note 15, *supra*. The Commissioner does not agree with Hambrick's justification.